UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| HAROLD RUNNING BIRD,<br>              Plaintiff,<br><br>vs.<br><br>TAMMY MERTENS-JONES, IN HER<br>INDIVIDUAL AND OFFICIAL CAPACITY<br>AS ADMINISTRATIVE REMEDY<br>COORDINATOR; DOUGLAS CLARK, IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY<br>AS SECRETARY OF THE SOUTH DAKOTA<br>DEPARTMENT OF CORRECTIONS; AND<br>DANIEL SULLIVAN, IN HIS INDIVIDUAL<br>AND OFFICIAL CAPACITY AS WARDEN<br>OF THE SOUTH DAKOTA STATE<br>PENITENTIARY;<br>              Defendants. | 4:21-CV-04197-ECS<br><br><br>OPINION AND ORDER GRANTING IN<br>PART AND DENYING IN PART<br>RENEWED MOTION FOR SUMMARY<br>JUDGMENT |

Inmates do not forsake the right to freely exercise their religion upon incarceration. Yet an inmate's religious exercise may be circumscribed in the pursuit of legitimate penological objectives. Harold Running Bird is a member of the Native American Church and an inmate at the South Dakota State Penitentiary (SDSP). He seeks a declaration that SDSP's policies are preventing him, and others similarly situated, from freely exercising their religion as protected under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the First Amendment, and the Fourteenth Amendment. The South Dakota Department of Corrections ("SDDOC"), SDSP, and their officers (Collectively, "Defendants") currently move for summary judgment on Running Bird's claims. Because there are genuine issues of material fact on some—but not all—of his claims, Defendants' motion is granted in part and denied in part.

1

## I.    Factual and Procedural Background

SDSP is South Dakota's maximum-security prison.  According to the SDDOC, SDSP has a maximum capacity of 426 inmates.[1]  As of September 30, 2024, the facility housed 771 inmates, with another 492 inmates at the Jameson Prison Annex.[2]  Overcrowded, the penitentiary has limited resources to offer its inmates.

To accommodate the Native American Church, SDSP currently offers four pow wows yearly.  Doc. 42-11 at 5.  These pow wows have two subsets: (1) family pow wows, which are hosted in a visitation room and capped at 90 attendants,[3] and (2) inmate-only pow wows hosted in the penitentiary's gymnasium.  Id.  SDSP delegates the discretion to designate how the four pow wows will be divided to the Native American Council of Tribes (NACT), a group of elected Native American inmates.  Doc. 42-11 at 5.  NACT currently divides the pow wows evenly— two family and two inmate-only pow wows each year.  Id.

Family pow wows last a single day and are broken into two sessions.  Doc. 42-11 at 9.  Because the visitation room has a maximum-occupancy of 90 people, participation is limited.  Id.  Inmates without family scheduled to attend are designated as alternates and may attend if no-shows open space in the room.  Id. at 10.  Given the demands for attendance, NACT has adopted a three-guest policy for each inmate participating.  Doc. 43 ¶ 25.  Running Bird describes how, during family pow wows, "families [and] kids" are "packed like sardines" in the visitation room and only have a "small 6x10 area to dance."  Doc. 1-1 at 2.

---

[1] SDDOC, <u>Presentation to Joint Committee on Appropriations</u>, 4 (last visited Oct. 24, 2024), <u>https://mylrc.sdlegislature.gov/api/Documents/Attachment/249899.pdf?Year=2023#:~:text=Metr ics:%20Overcrowded%20Facilities,Allows%20for%20proper%20custody%20classification</u>.
[2] SDDOC, <u>Adult Population</u>, Statistics (last updated Sept. 30, 2024), <u>https://doc.sd.gov/documents/AdultPopulationSeptember2024.pdf</u>.
[3] The record shows that three guards supervise the family pow wows, so the actual number allocated for inmates and their visitors is 87, not 90.  Doc. 42-11 at 9.

The below picture models the layout of the visitation room during a family pow wow.



Doc. 42-10.  As the picture illustrates, an MC table is set up along the left wall.  A drummer is stationed against the brick wall at the far end of the room.  And the middle of the room is reserved for dancing.  Defendants contend the tables are pressed against the wall and the chairs are set up between the two green lines to provide space for dancing in middle of the room.  Doc. 42 at 36; Doc. 43 ¶¶ 17–18.

Believing the present situation restricts his, and others similarly situated, religious practice, Running Bird submitted a Project Application requesting that Native American inmates be allowed to hold four three-day family pow wows annually.  Doc. 23-1.  To avoid the confines of the visitation room and allow more guests to attend, he asks that family pow wows be held in the gymnasium or outdoors in the penitentiary's recreation yard.  Id.  This, he claims, will positively impact the broader Native American community by giving families around the Sioux Falls area more "chance[s] to sing, dance, eat, [and] visit" with each other.  Id.  Running Bird adds that the opportunity to host these larger family pow wows would put Native American inmates on parity with other religious groups, such as Residents Encounter Christ ("REC") and Brothers in Blue, who he claims have three-day religious gatherings in the gym or recreation

yard with outside guests four times annually.[4]  Id.  Tammy Mertens-Jones, SDSP's then-Unit Manager/Cultural Activities Coordinator, denied Running Bird's application, specifying that pow wows would continue as-usual.  Id.

Running Bird later filed an Informal Resolution Request with SDDOC re-requesting permission to host family pow wows in the gym or recreation yard.  Doc. 1-1 at 4.  Here, he discussed how the visitation room is too small and cannot hold many people, so some inmates and their guests "cannot come to dance, sing, or feast" with the others.  Id.  SDDOC issued an Informal Resolution Response denying Running Bird's request, stating it had already "resolved [the issue] in a separate informal resolution request."  Id. at 3.

Undeterred, Running Bird sought an administrative remedy with SDDOC.  Id. at 2.  In his administrative request, he reiterated how nothing had been resolved and that Native American inmates were "still denied family pow wow[s] in the gym or recreation yard," despite other religious groups having permission to use those spaces.  Id.  Running Bird again described how Native Americans are only allowed six hours in a small room that does not allow for 89% of the Native American population to attend.  Id.  SDDOC again denied his request, stating that Running Bird "failed to clearly state [his] request for remedy."  Id. at 1.

SDSP also offers regular sweat ceremonies ("sweats"), tobacco ties, and pipe ceremonies. Doc. 23 at 36–39.  In a separate Project Application, Running Bird requests SDSP provide separate ceremonies for inmates in West Hall, which houses inmates in protective custody.  Doc. 23-2.  He alleges that Mertens-Jones has allowed gangs to control the ceremonies, which

---

[4] Tammy Mertens-Jones's deposition testimony clarified that Brothers in Blue holds religious events twice a year, not three, and REC has only one event per year.  Doc. 42-11 at 7.  Both groups have also chosen to hold their events in SDSP's chapel, not in the penitentiary's gymnasium or recreation yard.  Id.

"create[s] animosities [and] anger." Doc. 4-2 at 2. Running Bird contends that himself, West Hall inmates, and others who do not wish to interact with gangs, are thus foreclosed from partaking in their important rituals for fear of their safety. Doc. 23-2. Mertens-Jones denied the request. Id.

Running Bird appealed this denial as well, filing a Request for Administrative Remedy. Doc. 1-2 at 2–4. He re-asserted his and other's safety concerns, stating that inmates from West Hall feel threatened and "cannot interact with gangs." Id. SDDOC denied Running Bird's request because it was unclear "and raise[d] too many issues." Id. at 1.

Having exhausted his chances at administrative redress, Running Bird filed this lawsuit. He alleges that Defendants' "actions, decisions, policies and/or regulations" have infringed on his free exercise rights under RLUIPA and the First Amendment, and his substantive due process and equal protection rights under the Fourteenth Amendment. Doc. 14 at 6. Defendants previously moved for summary judgment when this case was before a different judge. Doc. 22. That motion was granted in part and denied in part. Doc. 36. Following additional discovery, Defendants filed a renewed motion for summary judgment on each of Running Bird's remaining claims, which are:

> (1) Two claims arising under RLUIPA against all defendants in their official capacities for injunctive relief;
> (2) A First Amendment free exercise claim for injunctive relief against all defendants in their official capacities arising out of the combined sweat ceremonies;
> (3) An equal protection claim against all defendants in their official capacities for injunctive relief; and
> (4) A free exercise claim arising from combined sweat ceremonies against Mertens-Jones in her individual capacity.

Doc. 42 at 1; see also Doc. 36 at 54.

This case was then transferred to the Undersigned.  Doc. 57.  Soon after, the Court heard argument on Defendants' renewed summary judgment motion.  Doc. 60.  For the reasons explained below, Defendants' motion is granted in part and denied in part.

## II.    Discussion

### a.    Summary Judgment Standard

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Main v. Ozark Health, Inc., 959 F.3d 319, 323 (8th Cir. 2020).  If the movant meets its burden, the nonmoving party must establish the existence of a genuinely disputed material fact by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A)–(B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

When ruling on a summary judgment motion, courts must view the facts and inferences fairly drawn from them in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); see also Baker v. Silver Oak Senior Living Mgmt. Co., 581 F.3d 684, 687 (8th Cir. 2009).  But courts do not "resort to speculation." Baker, 581 F.3d at 687 (quoting Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1126 (8th Cir. 2008)).  The judge's function during summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

6

issue for trial." Anderson, 477 U.S. at 249. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

### b.  Law-of-the-Case Doctrine

Although not argued in their responsive brief, at the hearing on the Renewed Motion for Summary Judgment, Running Bird's counsel argued that Defendants' second summary judgment motion violated the law-of-the-case doctrine. The law-of-the-case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Little Earth of United Tribes, Inc. v. U.S. Dep't of Hous. & Urb. Dev., 807 F.2d 1433, 1441 (8th Cir. 1986) (citing Arizona v. California, 460 U.S. 605, 618 (1983)). "The . . . doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings." Mosley v. City of Northwoods, 415 F.3d 908, 911 (8th Cir. 2005) (quoting Kan. Pub. Emps. Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., 114 F.3d 679, 687 (8th Cir. 1997)). But the doctrine "does not deprive [a] district court of the ability to reconsider earlier rulings." Conrod v. Davis, 120 F.3d 92, 95 (8th Cir. 1997). "[L]aw of the case is a doctrine of discretion, not a command to the courts." Little Earth of United Tribes, 807 F.2d at 1440 (citing Arizona, 460 U.S. at 618).

Running Bird's attempt to invoke the law-of-the-case doctrine misunderstands its rationale. The doctrine does not apply to a prior decision denying summary judgment. Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350, 1356 (Fed. Cir. 2009) (stating that the law-of-the-case doctrine "simply does not apply to a denial of summary judgment"); accord Mosley, 415 F.3d at 911 (holding that law-of-the-case doctrine did not preclude district court from

reconsidering denial of first summary judgment motion). The denial of a motion for summary judgment is an interlocutory order subject to reconsideration any time before a court enters final judgment in a case. Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that . . . does not end the action . . . may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities."). By its very nature, an order denying summary judgment does not resolve any legal issue or make any findings of fact. Switz. Cheese Ass'n v. E. Horne's Mkt., 385 U.S. 23, 25 (1966) (holding that district court's denial of a summary judgment motion seeking permanent injunction was interlocutory because it "d[id] not settle or even tentatively decide anything about the merits of the claim"). As a result, the law-of-the-case doctrine does not preclude this Court from considering Defendants' renewed summary judgment motion.

     **c.    First Amendment Free Exercise Claim**

     The First Amendment commands that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. The Fourteenth Amendment incorporates this prohibition and applies it against the States. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). Relevant here, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Mbonyunkiza v. Beasley, 956 F.3d 1048, 1053 (8th Cir. 2020) (quoting Turner v. Safley, 482 U.S. 78, 84 (1987)). "Prison inmates retain constitutional rights protected by the First Amendment, including the right to free exercise of religion." Singson v. Norris, 553 F.3d 660, 662 (8th Cir. 2009) (quoting Fegans v. Norris, 537 F.3d 897, 902 (8th Cir. 2008)). But a prisoner's constitutional rights are subject to limitation "in light of the needs of the penal system." Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 831 (8th Cir. 2009) (quoting

<u>Murphy v. Mo. Dep't of Corrs.</u>, 372 F.3d 979, 982 (8th Cir. 2004)).[5]  "A prison regulation or [policy] is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'"  <u>Murphy</u>, 372 F.3d at 982 (quoting <u>Turner</u>, 482 U.S. at 89).  Put more simply, an inmate retains only those rights consistent with proper incarceration. <u>Overton v. Bazzetta</u>, 539 U.S. 126, 131 (2003).

When analyzing a First Amendment free-exercise claim, the threshold question is whether prison officials have substantially burdened an inmate's sincerely held religious belief. <u>Mbonyunkiza</u>, 956 F.3d at 1053.  To constitute a substantial burden, a prison policy or regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

<u>Id.</u> (quoting <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 813 (8th Cir. 2008)).  "Once it is determined that a regulation imposes a substantial burden on a prisoner," the court shall proceed to determine whether the regulation is reasonably related to legitimate penological interests. <u>Gladson</u>, 551 F.3d at 833.

The Supreme Court has articulated four factors to aid courts in determining whether a prison policy is reasonably related to legitimate penological interests:

> (1) whether the policy has a valid rational connection to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the policy.

---

[5] "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." <u>Jones v. N.C. Prisoners' Lab. Union, Inc.</u>, 433 U.S. 119, 125 (1977).  Given those inherent limitations, constitutional claims arising in the prison context receive less scrutiny than "if raised by a member of the general population." <u>Murphy</u>, 372 F.3d at 982 (citing <u>Turner</u>, 482 U.S. at 81).

Hum. Rts. Def. Ctr. v. Baxter Cnty. Ark., 999 F.3d 1160, 1164 (8th Cir. 2021) (cleaned up) (quoting Overton, 539 U.S. at 132).  "These so-called Turner factors present factual and legal questions for which 'the district court must necessarily find the facts that either support or undermine the constitutionality of a particular [policy], [but] the ultimate conclusion as to constitutionality is a question of law.'"  Id. (alterations in original) (quoting Hill v. Blackwell, 774 F.2d 338, 343 (8th Cir. 1985)).  In assessing the constitutionality of a particular policy or regulation, "[c]ourts are to give 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.'"  Id. (quoting Overton, 539 U.S. at 132).  "The burden, moreover, is not on the State to prove the validity of the prison regulations but on the prisoner to disprove it."  Overton, 539 U.S. at 132.

In his affidavit, Running Bird professes that he "regularly attend[s] sweats . . . because they are a pinnacle of [his] religion."  Doc. 32-1 ¶¶ 7–8.  In his view, Inipi ceremonies—sweat ceremonies—"are a sacred communion and reconnection to The Creator."  Id.  Defendants do not dispute the importance of sweat ceremonies within the Native American faith.  See Doc. 42-12 at 14.

Running Bird alleges that SDSP substantially burdens his right to free exercise by failing to ensure sweat ceremonies are safe for all participants.  Doc. 14 ¶ 24.  He asserts that SDSP facilitates or otherwise allows unsafe sweat ceremonies by permitting rival gang members and gang victims to attend sweats at the same time.  Doc. 32-1 ¶¶ 5–7.  Running Bird claims this composition of inmates "creates an unsafe situation" and causes him to "fear for [his] safety during the ceremony."  Id. ¶¶ 5–6.  It is this fearful atmosphere that Running Bird alleges meaningfully curtails his ability to express adherence to his faith.

10

SDSP holds three sweat ceremonies a week.  Doc. 42-11 at 14.  Inmates practicing the Native American faith can sign up for any of the three sessions so long as they are not already full.  Id.  As Defendants point out, despite his alleged fears, Running Bird regularly signed up for and attended the same sweat ceremony every week.  Doc. 27 ¶ 85; Doc. 32-1 ¶ 4; Doc. 23 at Exs. 13–58.  And, by his own admission, "at no time [has he] witness[ed] an act of violence that [he] reported to SDSP staff during a sweat ceremony."  Doc. 42-13 at 3.  Had he observed threats of harm or violence, as a prior "fire keeper," Running Bird knows that any such behavior is to be reported to the Cultural Activities Coordinator.[6]  Doc. 44 ¶ 8; Doc. 42-11 at 5.

Defendants contend that inmates who engage in disruptive behavior or cause problems during sweats may be permanently or temporarily banned from attending them in the future.  Doc. 44 ¶ 10.  Based on Defendants' knowledge, however, there has "never been a recorded incident of violence taking place during an Inipi Ceremony at SDSP."  Id. ¶ 6; Doc. 45 ¶ 6; Doc. 42-11 at 14.  SDSP also takes increased security measures during sweats: a security camera is directed at the sweat lodge and continuously monitors the sweats while they are in progress.  Doc. 44 ¶ 7.  This too has never captured an incident of violence arising from a sweat ceremony.  See Doc. 27 ¶¶ 89–90.

Even after Running Bird filed his informal resolution request alleging that sweats are an unsafe environment, an investigation failed to corroborate his claim.  See Doc. 42-12 at 14.  In his deposition, Douglas Clark, Deputy Secretary for the SDDOC, described how Defendants reviewed the list of attendees, the schedule, and had discussions with several different groups

---

[6] Aside from "prepar[ing] the rocks prior to the sweat lodge ceremony, smudg[ing] the sweat lodge with sage, and put[ting] tobacco into the fire pit," a fire keeper also helps "to ensure that the sweat lodge ceremony remains safe for all participants."  Native Am. Council of Tribes v. Weber, 750 F.3d 742, 747–48 (8th Cir. 2014) (describing the role of a fire keeper at SDSP).

that attend sweats. Id. Yet Defendants could not "identify any specific information" regarding

Running Bird's allegations. Id.

Running Bird has not supported his claim with sufficient evidence to demonstrate a

substantial burden. To oppose a properly supported motion for summary judgment, Running

Bird must rely on more than "[m]ere allegations [that are] unsupported by specific facts or

evidence beyond [his] own conclusions." Eggers v. Wells Fargo Bank, 899 F.3d 629, 632–33

(8th Cir. 2018) (quoting Menz v. New Holland N. Am., Inc., 507 F.3d 1107, 1110 (8th Cir.

2007)). He must show the existence of a genuine dispute of material fact by citing to specific

parts of the record or by showing that the materials relied on by Defendants do not resolve a

genuine factual dispute. Fed. R. Civ. P. 56(c)(1)(A)–(B). Running Bird does neither. Instead,

Running Bird incorrectly states that Defendants reassert an argument the Court rejected in its

first order on summary judgment. Doc. 52 at 5. But, in that order, the Court more accurately

stated, "[D]efendants make *no argument* that the fearful atmosphere Running Bird experiences

does not rise to a substantial burden." Doc. 36 at 33 (emphasis added).

That is not now the case. Defendants' brief shows that no genuine dispute exists and

spells out why they are entitled to judgment as a matter of law on whether combined sweat

ceremonies substantially burden Running Bird's religious exercise. Doc. 42 at 14–17. In

response, Running Bird merely asserts without citing to specific facts or evidence that "the lack

of safety in sweats pose a substantial burden" and that "viewing the facts in the light most

favorable" to him, a genuine dispute exists. Doc. 52 at 5. This, however, will not suffice. At

this stage, he cannot rely on conclusory allegations "unsupported by specific facts or evidence."

Eggers, 899 F.3d at 632. No genuine issue of material fact remains in dispute on whether the

combined sweat ceremonies substantially burden Running Bird's religious exercise.

Because no genuine issue of material fact exists and Defendants are entitled to judgment as a matter of law on the substantial burden issue, the Court need not analyze his free exercise claim under the Turner factors. Gladson, 551 F.3d at 833. Yet doing so here further supports granting summary judgment in Defendants' favor on Running Bird's First Amendment claim.

The denial of separate sweat ceremonies bears a valid rational connection to SDSP's legitimate interests in maintaining institutional order, preserving resources, and negating negative collateral consequences. See Doc. 44 ¶¶ 19–26. Accommodating separate sweat ceremonies broadly impacts institutional operations. Id. ¶¶ 19–20. Because SDSP utilizes the Adult Internal Management System (AIMS) to control inmate movement within the facility, changing the operational schedule to account for more sweat ceremonies can broadly impact inmate movement and the operation schedule for various other services, including medication, health services, and meals. Id. ¶ 20. Managing inmate movement at a maximum-security prison "promote[s] internal security, perhaps the most legitimate penological goal." Overton, 539 U.S. at 133; see Hum. Rts. Def. Ctr., 999 F.3d at 1164 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained Constitutional rights of both convicted prisoners and pretrial detainees." (quoting Bell v. Wolfish, 441 U.S. 520, 546 (1979)).

Having determined that denying Running Bird's request for separate sweat ceremonies bears a rational connection to legitimate penological interests, the Court next considers whether alternative ways to exercise his religion exist. "Alternatives to [exercise one's faith] need not be ideal, . . . they need only be available." Overton, 539 U.S. at 135. If Running Bird could show "that no alternative means . . . existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable." Id. But he cannot make that showing. As the

Court noted in its first summary judgment order, Running Bird has several alternatives.  Doc. 36 at 35.  He can attend both family and inmate only pow-wows, four spiritual conferences per year, pipe ceremonies, tobacco ties, drum practice, and Native American Church.  Doc. 23 at 36–39; Doc. 36 at 35.  While this Court recognizes the importance of sweat ceremonies within Running Bird's religion, under the First Amendment, he "need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so."  Murphy, 372 F.3d at 983.

Also relevant is the impact that accommodating Running Bird's request would "have on guards and other inmates, and on the allocation of prison resources generally."  Turner, 482 U.S. at 90.  The Eighth Circuit has recognized that sweat ceremonies "expend significant prison resources, undoubtedly diverting limited resources from other areas of the prison."  Fowler v. Crawford, 534 F.3d 931, 943 (8th Cir. 2008).  When granting accommodations "will have a significant 'ripple effect' on fellow inmates or prison staff," Turner, 482 U.S. at 90, "courts should be particularly deferential to the informed discretion of corrections officials," id.  As mentioned above, accommodating separate sweats would require SDSP to adjust the institution's operating schedule.  Not only would this impact the availability of services for other inmates, it would also impact the mobility of inmates, Native American or otherwise, within the institution who are unable to or choose not to participate in sweat ceremonies.  See Doc. 44 ¶ 20. Moreover, Defendants posit that by accommodating separate sweat ceremonies for West Hall inmates, SDSP subjects itself to similar requests from the seven other housing units between the "Hill" and the "Jameson Prison Annex."  Id. ¶ 22.  If required to accommodate Running Bird's request, Defendants also anticipate an increase in requests for special accommodations from other religious groups within SDSP.  Id. ¶ 24.  In short, accommodating Running Bird's request

for separate sweat ceremonies can result in a significant ripple effect on SDSP's staff and operational resources. The Court therefore gives due deference to SDSP's informed discretion.

Finally, the Court "consider[s] whether the presence of ready alternatives undermines the reasonableness of the [policy]." Overton, 539 U.S. at 136. This last factor asks, "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates [his request] while not imposing more than a *de minimis* cost to the valid penological goal." Id. (citing Turner, 482 U.S. at 90–91). "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90. Running Bird does not propose a ready alternative. Instead, he argues that an issue of material fact exists as to whether an alternative exists that fully accommodates his request. Doc. 52. In her deposition, Mertens-Jones testified how inmates can work with her to avoid signing up for the same sweat as someone they feel unsafe or uncomfortable around. Doc. 42-11 at 15. Despite Running Bird's counsel recognizing this as a viable resolution to Running Bird's claim at the time of the deposition, id., they now dispute its genuineness since it is not a formal, codified policy, Doc. 52 at 5–6. But Running Bird makes no argument that he has tried to sign up for an alternative time in the past and Mertens-Jones failed to accommodate his request. "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating [Running Bird's] constitutional complaint." Turner, 482 U.S. at 90–91. Accordingly, Defendants' restriction on separate sweat ceremonies is reasonable under the First Amendment. Defendants are therefore granted summary judgment on Running Bird's remaining First Amendment Free Exercise Clause claim.

      **d.**      **Running Bird's Claims Under RLUIPA**

RLUIPA "provide[s] greater protection for religious exercise than is available under the First Amendment." Holt v. Hobbs, 574 U.S. 352, 357 (2015) (describing the history of "RLUIPA and its sister statute, the Religious Freedom Restoration Act"). In the prison context, the First Amendment permits regulations that substantially burden an inmate's religious exercise so long as the restriction is reasonably related to a legitimate penological interest. See Gladson, 551 F.3d at 831. RLUIPA, on the other hand, prohibits substantial burdens on an inmate's religious exercise "unless the government can demonstrate the burden (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Cutter v. Wilkinson, 544 U.S. 709, 714–15 (2005) (cleaned up) (discussing the identical test under the Religious Freedom Restoration Act, RLUIPA's precursor). RLUIPA also differs from the First Amendment in the scope of religious exercise it protects. The Act protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

Although RLUIPA applies broadly to protect "any exercise of religion," Running Bird must show that a prison policy or regulation "implicates his religious exercise," Ramirez v. Collier, 595 U.S. 411, 425 (2022), that is "sincerely based on a religious belief and not some other motivation," Hobbs, 574 U.S. at 360–61. Here, there is no dispute over the sincerity of Running Bird's religious beliefs or the integral role family pow wows and sweat ceremonies play in those beliefs.

Having established that a challenged prison policy implicates the exercise of a sincerely held religious belief, Running Bird must then prove the policy substantially burdened his religious exercise. 42 U.S.C. § 2000cc-2(b); Ramirez, 595 U.S. at 425 (citing Hobbs, 574 U.S. at 361). RLUIPA does not define "substantial burden." Instead, Congress expected courts to

interpret and apply the substantial burden standard in a manner consistent with "Supreme Court jurisprudence." 146 Cong. Rec. 16698 (2000) (Joint statement of Senators Orrin Hatch and Edward Kennedy).[7]  The test for determining whether the government has substantially burdened an inmate's right to religious exercise under RLUIPA is "*largely consistent with*" First Amendment jurisprudence.  Van Wyhe v. Reisch, 581 F.3d 639, 656 (8th Cir. 2009) (emphasis added).  Because RLUIPA's protection extends to religious exercise that is not "compelled by, or central to" an inmate's religious belief, the definition of substantial burden needs to be amended slightly to reflect that religious activities need not be *fundamental* to the inmate's religion.[8]

---

[7] RLUIPA "does not include a definition of the term 'substantial burden' because it is not the intent of this Act to create a new standard for the definition of 'substantial burden' on religious exercise.  Instead, that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence.  Nothing in this Act, including the requirement in section 5(g) that its terms be broadly construed, is intended to change that principle.  The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden on religious exercise." 146 Cong. Rec. 16698 (2000) (Joint statement of Senators Orrin Hatch and Edward Kennedy).  "Congress sought to eliminate 'frivolous or arbitrary' barriers impeding prisoners' exercise of religion." Fowler, 534 F.3d at 942 (quoting Cutter, 544 U.S. at 716); see also 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA ("Whether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways.")).

[8] Despite RLUIPA's instruction to the contrary, the Eighth Circuit has stated, "Whether or not RLUIPA's definition includes such a requirement, we have held that it is necessary to show that the existence of a sincerely held tenet or belief that is central or fundamental to an individual's religion is a prerequisite to a 'substantially burdened' claim under RLUIPA." Murphy v. Mo. Dep't of Corr., 506 F.3d 1111, 1115 (8th Cir. 2007).  While Murphy has not been explicitly overruled, more recent Eighth Circuit cases have noted that "this type of inquiry into what is or is not central to a particular religion has no place in [a] RLUIPA analysis." Weber, 750 F.3d at 750 (acknowledging that RLUIPA does not require a religious exercise to be fundamental or central to the inmate's religion); accord Payne, 85 F.4th at 878–79 (noting that religious beliefs need to be sincere but also citing Weber for the proposition that religious exercise need not be "central to a particular religion").  In any event, this collateral matter is immaterial to this case. Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008), instructs: "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA." Because there is no dispute over the sincerity or significance of Running Bird's religious exercise, this Court can assume the pow wows and

Gladson, 551 F.3d at 832–33.  Thus, in the RLUIPA context, the Eighth Circuit's definition of substantial burden can be restated as follows:

> must significantly inhibit or constrain conduct or expression . . . of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities [associated with] a person's religion.

Mbonyunkiza, 956 F.3d at 1053.  The Eighth Circuit has acknowledged that a substantial burden exists under RLUIPA when a prison policy "compels an inmate to choose between violating his religious beliefs or violating [said] policy and incurring disciplinary action."  Holt v. Payne, 85 F.4th 873, 879 (8th Cir. 2023) (citing Hobbs, 574 U.S. at 361).

Only after Running Bird sets forth a prima facie case does the burden switch to Defendants to prove the substantial burden imposed "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2).

### i.    Family Pow Wows

Running Bird claims that SDSP's policy of holding family pow wows in the visitation room substantially burdens his religious exercise because the room is too small to properly accommodate pow wow ceremonies.  In his affidavit, Running Bird—a ceremonial sun dancer—asserts that the visitation room does not provide dancers "adequate space" to perform the ceremonial dances "as they are meant to be performed." Doc. 32-1 ¶ 9.  According to Running Bird, dancers are afraid to fully perform in the space provided because it may damage their dance regalia, which consists of "fragile beads, feathers, and other items." Id. ¶ 8.

---

sweat ceremonies are fundamental and apply the same definition of substantial burden as applies in First Amendment cases.

In Defendants' initial summary judgment motion, they argued that Running Bird's religious exercise could not have been substantially burdened because he has not been excluded from the family pow wows. Doc. 23 at 20–30. They claimed that any impact the size of the visitation room had on the ceremony was merely an inconvenience. Id. at 33–35. The Court found Defendants' argument unavailing, noting that Defendants' definition of substantial burden is underinclusive. Doc. 36 at 25. In Defendants' view, a substantial burden cannot exist when an inmate attends their preferred religious ceremony, regardless of the restrictions imposed on the ceremony itself. Id. at 26. RLUIPA, however, was enacted "to provide very broad protection." Hobbs, 574 U.S. at 356. "[A]nd a plain reading of its text must include the specific content of, and conduct during, such ceremonies." Doc. 36 at 26 (citing 42 U.S.C. § 2000cc-5(7)(A)) (noting that "'religious exercise' includes *any* exercise of religion." (emphasis added)).

Along with reasserting their previous argument, this time around, Defendants also argue that Running Bird was not substantially burdened because neither himself nor other ceremonial dancers filed reports or complained that their regalia was damaged while performing at the family pow wows. Doc. 43 ¶ 22. But Defendants' argument misses the nuance of Running Bird's alleged infringement. He does not claim to have sustained damage to his regalia. Rather, he asserts the dancers must underperform the ceremonial dances out of fear that full expression in such a confined space will damage their regalia. It is this restriction on the dancer's ability to fully perform that Running Bird claims substantially burdens his religious exercise.

Viewing the facts in the light most favorable to Running Bird as the non-moving party, his detailed factual allegations regarding the size of the visitation room,[9] the number of people confined within the room, and the lack of available seating presents a genuine dispute as to whether holding family pow wows in the visitation room meaningfully curtails his religious exercise.  Doc. 32-1 ¶¶ 7–10.  Unlike his First Amendment claim, he did not rest on "a conclusory allegation that his religious exercise was 'substantially burdened.'"  Van Wyhe, 581 F.3d at 656.

Even if Running Bird can establish a substantial burden, the prison policy or regulation at issue may still be legally valid if it "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(1)–(2).  Consistent with their first summary judgment motion, Defendants maintain that hosting family pow wows in the visitation room furthers SDSP's interests in maintaining safety and security and preventing the smuggling in and use of contraband.  Doc. 42 at 26.  Courts "routinely recognize[] such interests as compelling."  Doc. 36 at 27–28; Hobbs, 574 U.S. at 363 (agreeing that prison "has a compelling interest in staunching the flow of contraband into . . . its facilities"); Fowler, 534 F.3d at 939 ("A prison's interest in order and security is always compelling." (collecting cases)); Murphy, 372 F.3d at 988 (acknowledging state department of corrections "has a compelling interest in institutional security").

Along with demonstrating a compelling governmental interest, Defendants must show the burden imposed is the least restrictive means of furthering its compelling interest.  Under the least restrictive means standard, "inadequately formulated prison regulations and policies

---

[9] This Court asked the parties about the visitation room's dimensions at the August 9, 2024 motion hearing, but neither party responded with any helpful precision.

grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice." Murphy, 372 F.3d at 988 (quoting S. Rep. 103–111 at 10 (1993)); accord Hamilton v. Schriro, 74 F.3d 1545, 1554 (8th Cir. 1996). Defendants need not "refute every conceivable option in order to satisfy the least restrictive means prong." Hamilton, 74 F.3d at 1556 (discussing RFRA's least restrictive means prong). But they must present some evidence that their policy is "the least restrict means necessary to preserve its security interest." Murphy, 372 F.3d at 989.

Here, however, a genuine dispute of material fact exists as to whether there are less restrictive alternatives to holding family pow wows in the visitation room. Presently, the parties have presented two polar positions for where and how family pow wows can be held. Running Bird requests that three-day family pow wows be held in the gymnasium or recreation yard four times per year and that they be held from 10:00 a.m. to 6:00 p.m. each day. Doc. 23-1. Conversely, SDSP argues that family pow wows must "continue in the . . . visit[ation] room in the current time allowed." Id. Based on the record before this Court, it is not clear that Defendants seriously considered viable alternatives, if any, on the spectrum between their position and the accommodation Running Bird requests. "While [D]efendants need not 'refute every conceivable option in order to satisfy the least restrictive means prong,' they must offer some evidence that they considered other alternatives . . . ." Native Am. Council of Tribes v. Weber, 897 F. Supp. 2d 828, 852 (D.S.D. 2012) (citing Fowler, 534 F.3d at 940). Instead, Defendants continue to assert that their policy is "reasonably" and "rationally" related to "legitimate" security and penological interests. See Doc. 42 at 26. Under RLUIPA's "exceptionally demanding" standard, Hobbs, 574 U.S. at 364, this does not suffice. Defendants' renewed motion for summary judgment on Running Bird's RLUIPA claims for family pow wows is denied.

### ii.    Combined Religious Ceremonies

Next, Defendants seek summary judgment on Running Bird's claim alleging that combined sweat ceremonies violate his right to free exercise of religion under RLUIPA. Running Bird's complaint alleges that Defendants violated his right to free exercise by failing to "ensur[e] [those] religious ceremonies, such as sweats, are safe for all participants." Doc. 14 ¶ 24. The Court denied Defendants' first motion for summary judgment on this claim because Defendants did not understand the nature of Running Bird's claim and argued for summary judgment under an Eighth Amendment deliberate indifference standard instead of RLUIPA's strict scrutiny standard. Doc. 36 at 33. In their renewed motion for summary judgment, Defendants now argue that Running Bird cannot show the combined sweat ceremonies substantially burden his religious exercise. As this Court explained in more detail above, supra sub-part II.c., Running Bird has not shown a genuine dispute of material fact as to whether the combined sweat ceremonies substantially burden his religious exercise. Because establishing a substantial burden is a threshold question, the Court need not analyze whether the prison policy is the least restrictive means of furthering a compelling governmental interest. See Murphy, 372 F.3d at 988 (proving a substantial burden is a threshold matter).

Even if a substantial burden did exist, SDSP's current practice of conducting combined sweat ceremonies furthers a compelling governmental interest and is the least restrictive way to furthering that interest. As to the compelling governmental interest prong, Defendants assert that their policy of combined sweat ceremonies furthers the compelling interests of institutional order and security. This is generally understood as a compelling interest. Fowler, 534 F.3d at 939 ("A prison's interest in order and security is always compelling.").

In assessing whether Defendants have shown their policy to be the least restrictive means of furthering a compelling interest, Courts must remain mindful of the "due deference" owed "to the experience and expertise of prison and jail administrators." Id. at 941 (quoting Cutter, 544 U.S. at 723). As Justice Blackmun recognized, "[a] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation." Id. at 940–41 (quoting Ill. State Bd. Elec. v. Socialist Workers Party, 440 U.S. 173, 188–89 (1979) (Blackmun, J., concurring)). Even under RLUIPA's broad protection, it is important to not let "religious accommodation[s] in the penological context . . . become the tail that wags the dog." Id. at 941 (quoting Lovelace v. Lee, 472 F.3d 174, 217 (4th Cir. 2006) (Wilkinson, J., dissenting)).

In two earlier cases, Hamilton, 74 F.3d 1545, and Fowler, 534 F.3d 931, the Eighth Circuit upheld complete bans on sweat ceremonies as being the least restrictive means of furthering each prison's interests in security and safety. While this Court recognizes that Hamilton and Fowler are unique because each case involved plaintiffs who took an all-or-nothing approach to their requested accommodation, the safety and security risks associated with sweat ceremonies in those cases are the same here. Despite that, Native American inmates at SDSP are allowed to attend any one of three different sweat ceremonies each week. Doc. 42-11 at 14. And if an inmate feels unsafe or uncomfortable attending sweats with a particular person or at a specific time, they can coordinate with the activities coordinator to attend a different session. Id. at 15. Inmates can also have their monitoring/separation status amended to avoid running into a particular inmate at sweats. See Doc. 42-12 at 15. Considering the deference owed to prison administrators and the far more restrictive alternatives approved by the Eighth Circuit, Defendants have met their burden of showing that its current practice of combined sweat

ceremonies is the least restrictive means of further their compelling governmental interests. Thus, Defendants' motion for summary judgment on Running Bird's combined sweat ceremonies claim under RLUIPA is granted.

**e.      Equal Protection Claim**

Running Bird also alleges that Defendants violated his right to equal protection under the Fourteenth Amendment by "[a]llow[ing] other religious groups to have religious ceremonies in larger spaces, such as [the prison] gym, then they have allowed for Native American religious ceremonies." Doc. 14 ¶¶ 36–37.  To succeed on his equal protection claim, Running Bird must show that Native American inmates participating in family pow wows are treated differently than a similarly situated group and show that any disparate treatment is motivated by purposeful discrimination.  Patel, 515 F.3d at 815–16; see Doc. 36 at 38–44.  For the reasons explained in the Court's first order on summary judgment, this Court applies the strict scrutiny standard to Running Bird's equal protection claim.  Doc. 36 at 38–44.  If Running Bird satisfies this threshold burden, Defendants must then show the disparate treatment is "necessary to further[ing] legitimate penological interests."  See Patel, 515 F.3d at 815–16.

Running Bird argues that inmates attending family pow wows are similarly situated to two other religious groups: REC and Brothers in Blue.  Both groups have held religious events in the gymnasium or recreation yard, and the events included outside guests.  Doc. 23-1; Doc. 23 at 64 n.8.  As such, Running Bird asserts that inmates attending family pow wows are treated differently because they must use the visitation room.  Defendants raise two arguments in response.  First, they argue the family pow wow group is not similarly situated to REC or Brothers in Blue because pow wows have far more attendees.  Second, the outside guests that

24

attend events for REC and Brothers in Blue do not include family or guests on an inmate's visitation list. The Court will address each argument in turn.

Given the nature of Running Bird's equal protection claim, the size of each group's religious event is relevant for determining whether the groups are similarly situated. The Court's first summary judgment order determined that a genuine dispute of material fact existed on whether the family pow wow group is similarly situated to REC and Brothers in Blue because there were no clear attendance records for each group's events. The supporting documents Defendants filed along with their renewed summary judgment motion resolves that factual dispute. See Doc. 42 at Exs. 1–13.

In Mertens-Jones's deposition, she explains the visitation room has a maximum occupancy of 90 people. Because three guards supervise the pow wows, 87 spots are available for inmates and their guests at each of the two sessions, 174 spots total. Doc. 42-11 at 9. If more than 87 people sign up for each session, inmates without family attending are designated as alternates. Id. at 10. Alternates are allowed to attend if fewer than 87 people show up on the day of the pow wow. Id. Based on the records provided, at every family pow wow but one between June 2017 and December 2018, the combined number of guests signed up to attend the two sessions was between 180 and 200. See Doc. 23 at Exs. 3–10. That figure does not include the list of alternates or guests unable to sign up because the sign-up sheet already exceeded capacity.

In contrast, attendance at Brothers in Blue and REC events is much less. Records from the March 2023 Brothers in Blue event reveals that 70, 58, and 51 people attended each of these three-day events, respectively. Doc. 43 ¶ 32. The March 2023 attendance record is commensurate to past Brothers in Blue events. For example, at its October 2022 event, 56, 50, and 47 people attended each of the three-days. Id. ¶ 33. REC fairs no better; attendance at its

events is lower still.  At REC's December 2022 event, it had between 22–25 participants attend each of the three days.  Id. ¶ 34.  Even when viewed in a light most favorable to Running Bird, there is a sizeable difference in attendance among the three religious groups.  But this Court need not determine whether the groups are similarly situated based on size alone.

Along with size, the composition of people attending the religious events is relevant to whether the groups are similarly situated.  In their first summary judgment motion, Defendants maintained that family pow wows had to be held in the visitation room because the events allowed family to attend while other groups' religious events did not.  But this Court found a factual dispute existed based on Mary Montoya's affidavit, which stated that other religious events "typically do not include family or friends," thus implying that they sometimes do.  Doc. 36; Doc. 26 ¶ 40.  Defendants have since clarified that religious events held in the gym or recreation yard, regardless of the group holding said event, may include outside guests.  Those outside guests, however, are not family members or individuals on an inmate's visitation list.  Doc. 42-11 at 11; Doc. 44 ¶ 40.  Rather, they are religious figures or outside volunteers that help run the event.  Doc. 44 ¶ 40.  Mertens-Jones's deposition testimony specifies that individuals on an inmate's visitation list are not allowed to attend religious events other than those held in the visitation room.  Doc. 42-11 at 6–7.  In this sense, REC's and Brothers in Blue's religious events appear to be no different from the non-family pow wows NACT holds in the gym twice year.  See id.  Outside guests are allowed to attend inmate only pow wows, so long as they are not on any inmate's visitor list.  Id. at 6.  But the lack of family or visitation list guests wholly distinguishes REC and Brothers in Blue events from family pow wows.

Running Bird has not pointed to any material in the record to rebut or dispute Defendants' assertion.  To the contrary, records from past cultural activities further support

26

Merten-Jones's deposition testimony. Religious activities that include "family" in the name are held in the visitation room, even if the religious group's normal service is held elsewhere. Docs. 23-59–23-62. For example, the Cornerstone Church ordinarily holds its faith fellowship in SDSP's chapel, but Cornerstone's family worship service is always held in the visitation room. See id. Based on these activity records, the group attending family pow wows appear to be more similarly situated to the Cornerstone church group than REC or Brothers in Blue. And they do not appear to be treated any differently than the Cornerstone church when hosting family-attended events. These records support Defendants' contention that visitors, like family, who are on an inmate's visitation list are only allowed within the visitation room, not other parts of the prison complex.

Even if guests from an inmate's visitation list were allowed to attend the religious events for REC and Brothers in Blue, Running Bird has provided no evidence that children were allowed among those in attendance. But see Doc. 44 ¶ 40 (stating outside visitors did not include children). It is Running Bird's burden to show disparate treatment from a similarly situated group. Here, neither party disputes that children regularly attend the family pow wows. And Running Bird does not contest that children present a unique security concern for a maximum-security prison. The attendance of children at family pow wows and not religious events held by REC and Brothers in Blue on its own justifies treating the two groups differently. Thus, given the difference in size, composition of attendees, and the inclusion of children, the group attending family pow wows is not similarly situated to REC or Brothers in Blue. Because the groups are not similarly situated, the Equal Protection Clause does not prohibit them from being treated differently.

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, but that does not relieve Running Bird from having to show a genuine dispute of material fact for disparate treatment from others similarly situated. He has failed to do that here. As a result, Defendants' motion for summary judgment on Running Bird's remaining equal protection claim is granted. Because Running Bird has not made out a prima facie case of disparate treatment from a similarly situated group, this Court need not consider the strict scrutiny portion of the analysis.

### f.    Qualified Immunity

Defendants lastly move for summary judgment on the sole surviving claim for money damages against Mertens-Jones, asserting she is entitled to qualified immunity. "[O]fficials engaged in executive functions, such as the operation of penal institutions, enjoy qualified immunity." Thomas v. Gunter (Thomas I), 32 F.3d 1258, 1261 (8th Cir. 1994). "Qualified immunity shields government officials from civil liability for a discretionary act that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Irvin v. Richardson, 20 F.4th 1199, 1204 (8th Cir. 2021) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because "[q]ualified immunity is an immunity from suit, not a mere defense to liability," De La Rosa v. White, 852 F.3d 740, 743 (8th Cir. 2017), it is imperative to "resolv[e] immunity questions at the earliest possible stage in the litigation," Irvin, 20 F.4th at 1204 (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Immunity "is effectively lost if a case is erroneously permitted to go to trial." Pearson, 555 U.S. at 231.

"On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the

deprivation.'" Walton v. Dawson, 752 F.3d 1109, 1116 (8th Cir. 2014) (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)).

The Court previously denied Defendants' assertion of qualified immunity on Running Bird's free exercise claim arising from the combined sweat ceremonies only because Defendants applied the wrong legal standard to argue that no constitutional violation occurred. Doc. 36 at 51. Defendants now reassert Mertens-Jones's claim for qualified immunity, this time applying the correct law. Because the Court determined above that holding combined sweat ceremonies did not violate Running Bird's First Amendment right to free exercise, Mertens-Jones is entitled to qualified immunity. See Garcia v. City of New Hope, 984 F.3d 655, 663 (8th Cir. 2021) (a defendant is entitled to qualified immunity *unless* they *violated* a clearly established constitutional right), abrogated on other grounds by Laney v. City of St. Louis, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023).

Even if there were a constitutional deprivation, the right was not clearly established. For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Court decides whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam). The specific right at issue here is whether maximum-security inmates have a right to separate sweat ceremonies to avoid a fearful atmosphere. While it is "clearly established law . . . that prison officials must afford inmates a reasonable opportunity to practice their religion," Thomas v. Gunter (Thomas II), 103 F.3d 700, 703 (8th Cir. 1997), no law guarantees maximum-security prison inmates the right to participate in regular, let alone separate, sweat ceremonies with a group of their choice. See Ehlers v. City

of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2017) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." (quoting Anderson, 483 U.S. at 640)). Eighth Circuit "decisions make it clear that . . . prohibiting sweat lodge ceremonies [in their entirety] do[es] not violate an inmate's constitutional right to free exercise of religion." Hamilton, 74 F.3d at 1551; see Kemp v. Moore, 946 F.2d 588 (8th Cir. 1991) (per curiam) (affirming district court's denial of prisoner's request for an order requiring prison to construct a sweat lodge); cf. Fowler, 534 F.3d 931 (affirming district court and holding that prison's policy against sweat lodges pass strict scrutiny under RLUIPA). Thus, the weight of legal authority does not support finding a right to separate weekly sweat ceremonies is clearly established.

### III.    Jury Trial Demand

Running Bird's Complaint demands a jury trial. Doc. 14; Doc. 1 at 8 (civil cover sheet). But the only claim to survive summary judgment is Running Bird's free exercise claim for family pow wows under RLUIPA. Monetary damages are unavailable under RLUIPA. Running Bird's surviving claim is therefore limited to declaratory and injunctive relief, both equitable remedies. There is no right to a jury trial on claims limited to equitable relief. See, e.g., Hornsby v. St. Louis Sw. Ry. Co., 963 F.2d 1130 (8th Cir. 1992) (holding that a plaintiff is not entitled to a jury trial when claims are equitable in nature); Baum v. Blue Moons Ventures, LLC, 513 F.3d 181, 193 (5th Cir. 2008) ("Unless Congress has expressly provided to the contrary, an injunction is an equitable remedy that does not invoke a constitutional right to a jury trial."); Kramer v. Banc of Am. Sec., LLC, 355 F.3d 961, 966 (7th Cir. 2004) ("There is no right to a jury where the only remedies sought (or available) are equitable." (citations omitted)); Holt v. Payne, 22-cv-00553, 2024 WL 3166079, at *1 n.2 (E.D. Ark. June 25, 2024) (noting the absence

of a jury question since plaintiff seeks only injunctive relief). Running Bird's request for a jury trial is, therefore, denied. The Court will be in contact with counsel soon to schedule a bench trial on the lone remaining claim for family pow wows under RLUIPA.

## IV. Conclusion

For the above reasons, it is hereby

ORDERED that Defendants' Renewed Motion for Summary Judgment, Doc. 41, is denied as to the claim below:

1. Running Bird's family pow wow claim under RLUIPA against all Defendants in their official capacities seeking injunctive relief. It is further

ORDERED that Defendants' Renewed Motion for Summary Judgment, Doc. 41, is granted as to the following claims:

1. Running Bird's claim for separate sweat ceremonies under RLUIPA against all Defendants in their official capacities seeking injunctive relief.

2. Running Bird's free exercise claim for injunctive relief against all Defendants in their official capacities arising out of the combined sweat ceremonies.

3. Running Bird's equal protection claim against all Defendants in their official capacities for injunctive relief.

4. Running Bird's free exercise claim arising from combined sweat ceremonies against Mertens-Jones in her individual capacity. It is finally

ORDERED that Running Bird's demand for a jury trial is denied.

DATED this _____ day of November, 2024.

BY THE COURT:

_____
ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE